# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RANCHO VISTA DEL MAR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No, 22-141 (DLF) |
| | ) | |
| v. | ) | Hon. Dabney L. Friedrich |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO THE
## GOVERNMENT'S MOTION TO DISMISS

Nancie G. Marzulla
Roger J. Marzulla
Marzulla Law, LLC
1150 Connecticut Ave. NW,
Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com
Bar No. 400985
Bar No. 394907

Dated: June 14, 2022                                             Counsel for Plaintiff

## Table of Contents

Table of contents...................................................................................................................... ii

Table of authorities ................................................................................................................ iii

Table of exhibits .................................................................................................................... v

Factual and procedural background ....................................................................................... 2

Standard of Review................................................................................................................. 4

Argument

1.    Rancho Vista has standing because its injury is redressable under retained statutory
authorities that were not terminated by the President Proclamation................................... 5

     1.1    The Presidential Proclamation makes exceptions, so the Rancho Vista site need
not be left in its current, dangerous condition........................................................ 7

     1.2    The Department of Defense has independent border fence construction authority
under 10 U.S.C. § 284........................................................................................... 10

     1.3    The Department of Homeland Security, too, has independent border fence
construction authority .......................................................................................... 12

2.    Rancho Vista's First Claim states a cognizable claim for relief from the Government's
action that is destroying its property.................................................................................. 15

     2.1.    Rancho Vista has stated a claim under the Administrative Procedure Act............ 15

     2.2.    Rancho Vista has also stated a non-statutory claim for relief.............................. 18

3.    Section 2808 was not operative after January 20, 2021, and did not exempt the Government's
action from NEPA and Endangered Species Act requirements............................................. 21

     3.1.    Any NEPA or Endangered Species Act exemption was terminated on January 20, 2021.
............................................................................................................................. 22

     3.2.    NEPA applies to the Government's actions to create and maintain a border gap to
channel immigrants onto Rancho Vista's property ................................................ 23

     3.3.    The Government's construction of an opening in the border fence to channel immigrants
adversely affects endangered species habitat ...................................................... 24

4.    Rancho Vista was not required to give the Agency a 60-day notice ..................................... 27

Conclusion .............................................................................................................................. 29

## Table of authorities

Cases

*American School of Magnetic Healing v. McAnnulty*,
  187 U.S. 94, 108, 118 (1902). ........................................................................... 19
*Arizona v. Mayorkas*,
  2022 WL 357348 (D.Ariz. 2022) ........................................................................ 24
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009). ........................................................................................... 5
*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119, 1129 (D.D.C. 2015) .................................................................... 5
*Bell Atl. Corp. v. Twombl*y,
  550 U.S. 544, 556 (2004). .................................................................................... 5
*Browning v. Clinton*,
  292 F.3d 235, 242 (D.D.C. 2002) ....................................................................... 5
*Cary v. Hall*,
  2006 WL 6198320 (N.D.Cal. 2006) ................................................................... 29
*Chamber of Commerce v. Reich*,
  74 F.3d 1322, 1324 (D.C. Cir. 1996) ................................................................. 18
*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................... 16
*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063 (2021) ........................................................................................ 17
*Conservation Law Found. v. Ross*,
  422 F.Supp.3d 12, 16 (D.D.C. 2019) ................................................................. 17
*Duke Power Company v. Carolina Environmental Study* Group,
  438 U.S. 59 (1978) ............................................................................................. 18
*E. Enters. v. Apfel*,
  524  U.S. 498 (1998) .......................................................................................... 18
*Ecological Rights Foundation v. FEMA*,
  384 F.Supp.3d 1111, 1020 (N.D. Cal. 2019) ..................................................... 26
*Feldman v. Federal Deposit Insurance Corporation*,
  879 F.3d 347, 351 (D.D.C. 2018) ....................................................................... 4
*Hamilton v. United States*,
  502 F.Supp.3d 266, 273 (D.D.C. 2020)............................................................... 5
*International Indus. Park, Inc. v. United States*,
  80 Fed.Cl. 522 (Fed. Cl. 2008) ..........................................................................17
*Jeong Seon Han v. Lynch*
  223 F. Supp.3d 95, 103 (D.D.C. 2016).................................................................. 4
*Kaiser v. Aetna v. United States*,
  444 U.S. 165, 176 (1979)..................................................................................... 17
*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F3d 1006, 1020 (9th Cir. 2012)................................................................... 26
*Loretto v. Teleprompter Manhattan CATV Corp.*

458 U.S. at 432–33, 434–35 (1982) .................................................................................... 17

*Lujan v. Defenders of Wildlife*,
504 U.S., 555, 560-61 (1992) ............................................................................................... 7

*Moyer v. United States*,
190 F.3d 1314, 1318 (Fed. Cir. 1999) .................................................................................. 4

*Nollan v. California Coastal Com'n*,
483 U.S. 825, 831-32 (1987) .............................................................................................. 24

*Omaha Public Power District v. United States*,
69 Fed. Cl. 237 (2005) .......................................................................................................... 5

*Otay Mesa., v. United States*,
144 F.Supp.3d 35, ................................................................................................................. 6

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*,
144 F.Supp.3d 35, 57 (D.D.C. 2015) ................................................................................... 7

*Penn Triple S v. United States*,
538 U.S. 921 (2003) .............................................................................................................. 5

*Phoenix Consulting v. Republic of Angola*,
216 F.3d 36, 40 (D.C. Cir. 2000) ......................................................................................... 4

*Reynolds v. Army and Air Force Exchange Service*
846 F.2d at 747 (Fed. Cir. 1988) .......................................................................................... 4

*Robertson v. Methow Valley Citizens Counsel*,
490 U.S. 332, 350 (1989) .................................................................................................... 23

*Ryan, LLC v. Lew*,
934 F.Supp.2d 159, 165 (D.D.C. 2013) ............................................................................... 5

*Safari Club Int'l v. Jewell*,
960 F.Supp.2d 17, 58-9 (D.D.C. 2013) .............................................................................. 29

*Scheuer v. Rhodes*,
416 U.S. 232, 236 (1974) ...................................................................................................... 4

*Sierra Club v. U.S. Army Corps of Engineers*,
803 F.3d 31, 36 (D.C. Cir. 2015) ....................................................................................... 23

*Tennessee Valley Auth. V. Hill*,
437 US 153, 184 (1978) ...................................................................................................... 25

*Tuthill Ranch, Inc. v. United States*,
381 F.3d 1132 (Fed. Cir. 2004) .......................................................................................... 17

*Thomas v. Washington Metropolitan Area Transit Authority*,
305 F.Supp.3d 77, 81 (D.D.C. 2018) .................................................................................... 4

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579, 587 (1952) ...................................................................................................... 7

*Wyoming Outdoor Council v. Bosworth*,
284 F.Supp.2d 81, 81 (2003) .............................................................................................. 29

*iv*

**Table of exhibits**

Exhibit 1:     Declaration of David Wick (June 14, 2022)

Exhibit 2:     Letter from CJW Joint Venture to Rancho Vista del Mar (May 28, 2021)

**Plaintiff's Response to the Government's Motion to Dismiss**

Defendant's, the United States, Motion to Dismiss is based on a mischaracterization of Plaintiff's, Rancho Vista del Mar, claim in this case. Contrary to what the Government argues, Rancho Vista does not challenge the January 20, 2021, Presidential Proclamation, which pauses (not halts as the Government incorrectly contends), construction of the border fence immediately adjacent to the Rancho Vista property, nor any exercise of the Government's emergency authority under 10 U.S.C. § 2808.

The Government action Rancho Vista does challenge is the May 1, 2021, order given by the U.S. Army Corps of Engineers to federal contractors, who were constructing the fence immediately adjacent to Rancho Vista's land, to abandon their construction site abruptly. Referenced in the May 28, 2021 letter from CJW Joint Venture to Rancho Vista,[1] the May 1, 2021 order to "stop all work, make no further shipments, place no further orders. . . and terminate all subcontracts,"[2] has left a 700-foot gap in the border fence that now operates to funnel daily large numbers of illegal entrants onto Rancho Vista's land, thereby resulting in conditions that endanger human safety, protected species, and Rancho Vista's property rights in its land, which contains valuable critical habitats for those protected species. This challenged agency action occurred more than three months after the January 20, 2021, Presidential Proclamation[3]—and was not compelled by it (as the Government erroneously argues). Neither the Presidential Proclamation nor any other federal statute requires that the Government inflict this continuing, arbitrary injury on Rancho Vista, in violation of its Fifth Amendment property rights. The action also violates crucial environmental statutes, the National Environmental Policy

---

[1] Letter from CJW Joint Venture to Rancho Vista del Mar (May 28, 2021), attached as Exhibit 2.
[2] *Id.*
[3] Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021).

Act (NEPA) and the Endangered Species Act (ESA), which were applicable at the time of the Government action.

This Court therefore has ample jurisdiction to reverse and set aside this arbitrary, destructive, and purposeless governmental action.

**Factual and Procedural Background**

Plaintiff, Rancho Vista del Mar, owns 496.56 acres of unimproved land in the Otay Mesa area of San Diego County, California, adjacent to the Mexican border. Portions of Rancho Vista's land have been designated as non-native grassland, a fragile and rare habitat protected by California law; other portions are within or near coastal wetland habitat, seasonal wetland vernal pool habitat, and other occupied endangered species habitat.[4] This includes habitat for some of the 85 species prioritized for protection by the San Diego County Multiple Species Conservation Program, including designated critical habitat for the Quino checkerspot butterfly, the San Diego fairy shrimp, and the Riverside fairy shrimp, the coastal California gnatcatcher, and the least Bell's vireo.[5]

In 2019, Rancho Vista deeded to the United States a parcel of approximately 17.04 acres of its land, which the Government had requested for the purpose of constructing a segment of the border fence immediately adjacent to Rancho Vista's property.[6] About a year later, the Government's contractor began construction, which included extensive grading, earth-moving, pouring of concrete foundations, and the installation of 30-foot-high steel bollards.[7] By early 2021, government contractors had constructed a continuous steel fence along the United States and Mexican border, stretching for miles both east and west from Rancho Vista's property,

---

[4] Compl. at 1.
[5] *Id.*
[6] *Id.* at 9.
[7] *Id.* at 10.

creating a barrier to undocumented immigrants coming from Mexico. The sole opening in this fence for many miles to the east and west is a gap approximately 700 feet wide that opens directly onto Rancho Vista's property.[8]

In May of 2021, the Government, acting through the Corps of Engineers, ordered its contractors to stop work and abandon the construction site, leaving the area open to environmental destruction from the elements and from the undocumented immigrants who, in the hundreds, nightly pass through the entrance the Government has created in the fence, and stream across Rancho Vista's property. Because the border fence extends for miles to both the east and the west of Rancho Vista's property, the border fence configuration as currently constructed causes undocumented immigrants wishing to enter the United States to be channeled along the existing fence line until they reach the gap in the fence, through which they pass onto Rancho Vista's property, trampling and destroying the fragile endangered species and their habitat located there.[9]

The Government's order to its contractors to abandon the partially graded and partially constructed site, without taking any measures to prevent harm to people or the environment, has caused ongoing erosion, de-sedimentation, destruction of habitat, and threatened the continued existence of endangered species on and near Rancho Vista's property.[10] The order's abrupt cessation of border fence construction also creates a dangerous condition for undocumented immigrants attempting to traverse the area in the dark and the Border Patrol agents who attempt to intercept them.[11]

---

[8] *Id*. at 11.
[9] *Id*. at 13.
[10] *Id.* at 14.
[11] Pl.'s Decl. at 4.

The Government admits that "[h]ad D.O.D. finished the San Diego 4 project, the San Diego 4 barrier segments would have connected to primary and secondary barrier segments constructed by DHS and formed a contiguous line of primary and secondary barrier," leaving no gap to channel immigrants onto Rancho Vista's land.[12] The Government's Motion to Dismiss offers no rational reason why this critical safety measure has not been taken.

**Standard of Review**

Courts, when deciding a motion to dismiss for lack of subject matter jurisdiction, "treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from facts alleged."[13] The Court's role in a jurisdictional challenge under Rule 12(b)(1) "is necessarily a limited one."[14] "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[15] When jurisdictional facts alleged in the complaint are disputed, courts must go beyond the pleadings and resolve any disputed issues of fact, the resolution of which is necessary to a ruling upon the motion to dismiss.[16] If the jurisdictional facts alleged in the complaint are disputed, the "court may consider relevant evidence in order to resolve the factual dispute."[17] But, the inquiries into standing and merits are separate and require the court assume the merits of plaintiff's case.[18]

---

[12] Def.'s Mot. to Dismiss at 3.

[13] *Thomas v. Washington Metropolitan Area Transit Authority*, 305 F.Supp.3d 77, 81 (D.D.C. 2018), quoting *Jeong Seon Han v. Lynch*, 223 F. Supp.3d 95, 103 (D.D.C. 2016).

[14] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

[15] *Scheuer*, 416 U.S. at 236.

[16] *Feldman v. Federal Deposit Insurance Corporation*, 879 F.3d 347, 351 (D.D.C. 2018); *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

[17] *Reynolds*, 846 F.2d at 747; *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (holding that "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.").

[18] *See generally Ryan, LLC v. Lew*, 934 F.Supp.2d 159, 165 (D.D.C. 2013).

As the moving party, the Government bears the burden that the complaint should be dismissed under Rule 12(b)(6). Rule 12(b)(6) motions test the sufficiency of a pleading.[19] A claim may be dismissed only if it asserts a theory that is not cognizable as a matter of law or because it fails to allege sufficient facts to support an otherwise cognizable legal claim.[20] The court presumes that all well-pleaded allegations are true, resolves all doubt and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party.[21] While formulaic recitations of causes of action are not enough, well-pleaded complaints survive motions to dismiss even if recovery is remote or unlikely.[22] Factual allegations in complaints need only "raise a right to relief above the speculative level."[23]

As the Supreme Court held in *Bell Atlantic v. Twombly*, a complaint must only "state a claim to relief that is plausible on its face"[24] and its "factual allegations must be enough to raise a right to relief above the speculative level . . . ."[25] In *Ashcroft v. Iqbal*, the Supreme Court ruled that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[26]

**Argument**

**1.      Rancho Vista has standing because its injury is redressable under retained statutory authorities that were not terminated by the Presidential Proclamation**

The Government argues that Rancho Vista lacks standing because (according to the Government) the Court cannot redress the Government's arbitrary decision to abandon the

---

[19] *Browning v. Clinton*, 292 F.3d 235, 242 (D.D.C. 2002).
[20] *Omaha Public Power District v. United States*, 69 Fed. Cl. 237 (2005).
[21] *Penn Triple S v. United States*, 538 U.S. 921 (2003).
[22] *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.D.C. 2015); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2004).
[23] *Hamilton v. US* 502 F.Supp.3d 266, 273 (D.D.C. 2020); *Twombly,* 550 U.S. at 555.
[24] *Twombly* at 547.
[25] *Id.* at 555, 570.
[26] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Rancho Vista construction site, where it created today's dangerous and destructive condition. The entire Government standing argument is based on the January 20, 2021, Presidential Proclamation, which terminated emergency military authority under 10 U.S.C. § 2808. But this argument fails because it ignores the exceptions to the pause in border fence construction created by the Presidential Proclamation itself, as well as the completely separate statutory authorities provided by 10 U.S.C. § 284 and 8 U.S.C. § 1103—statutory authorities unaffected by the Presidential Proclamation.

Because this Court is not powerless to remedy its ongoing injury, Rancho Vista has standing to bring this suit—and the Government's argument for dismissal for nonredressability fails. In a prior case in which Rancho Vista (and two adjacent property owners) challenged the Government's designation of their properties as critical habitat for the endangered Riverside fairy shrimp, this Court stated the three requirements for constitutional standing established by the Supreme Court:

> First, the plaintiff must have suffered an injury[-]in[-]fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[27]

This Court characterized the Government's argument that the three landowners lacked standing under the Administrative Procedure Act (APA), ESA, and NEPA as "puzzling," and concluded that "it is self-evident from a review of the administrative record that Otay Mesa has a

---

[27] *Otay Mesa., v. United States*, 144 F.Supp.3d 35, quoting *Lujan v. Defenders of Wildlife*, 504 U.S., 555, 560-61 (1992).

personal stake in this matter and, thus, has constitutional standing to seek review."[28] The same is true here: Government action now threatens to destroy the same critical habitat the Government designated for protection—habitat that has substantial value as mitigation land under local land development ordinances and the multi-species habitat plan approved by the United States for the Otay Mesa area. Because the order of this Court will stop the channeling of immigrants onto this critical habitat area—the cause of Rancho Vista's injury—this case satisfies the *Lujan* redressability requirement, and Rancho Vista has standing to bring these claims.

### 1.1   The Presidential Proclamation makes exceptions, so the Rancho Vista site need not be left in its current, dangerous condition

The Government is mistaken when it argues that the Presidential Proclamation, standing alone, has the force of law. It does not. As the Supreme Court held in *Youngstown Sheet & Tube Co. V. Sawyer*, "we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production."[29] Invalidating President Truman's Executive Order that the Government take control of the nation's steel plants, the Supreme Court held that the Constitution entrusts Congress, not the President, with lawmaking power.

Within the framework of our Constitution, the President's power to see that the laws are faithfully executed is inconsistent with the idea that he or she is to be a lawmaker.[30] The Constitution limits the President's functions in the lawmaking process to the recommending of laws considered wise and the vetoing of laws considered unwise.[31] The Constitution is neither

---

[28] *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F.Supp.3d 35, 57 (D.D.C. 2015).
[29] *Youngstown Sheet & Tube Co. v.* Sawyer, 343 U.S. 579, 587 (1952).
[30] *Id.* at 587
[31] *Id.*

silent nor equivocal about who can make laws that the President is to execute. The first section of the first article states: "All legislative Powers herein granted shall be vested in a Congress of the United States. . . ."[32]

Here, the January 20, 2021, Presidential Proclamation had only the power and effect, granted by Congress, for the President to initiate and terminate the emergency construction authority in 10 U.S.C. § 2808. The words of the Proclamation terminated the emergency authority granted by that statute—no more. The Proclamation limits its effect to canceling the emergency:

> I, Joseph R. Biden Jr., President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 202 of the National Emergencies Act (50 U.S.C. 1601 et seq.), hereby declare that the national emergency declared by Proclamation 9844, and continued on February 13, 2020 (85 Fed. Reg. 8715), and January 15, 2021, is terminated and that the authorities invoked in that proclamation will no longer be used to construct a wall at the southern border.[33]

Nor did the Proclamation purport to halt all wall construction, as the Government argues. Rather, the terms of the Proclamation merely paused—not halted—construction to allow for further planning:

> Section 1. Pause in Construction and Obligation of Funds.
> (a) The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Director of the Office of Management and Budget, shall direct the appropriate officials within their respective departments to:
>> (i) pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of this proclamation, to permit:
>>> A) assessment of the legality of the funding and contracting methods used to construct the wall;
>>> (B) assessment of the administrative and contractual consequences of ceasing each wall construction project; and

---

[32] U.S. Const. art.1, § 1
[33] Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021).

(C) completion and implementation of the plan developed in accordance with section 2 of this proclamation;[34]

The Proclamation further requires the preparation of a plan to redirect funding as allowed by law, within 60 days, after which Government agencies were to resume, modify, or terminate projects:

Sec. 2. Plan for Redirecting Funding and Repurposing Contracts. The Secretary of Defense and the Secretary of Homeland Security … shall develop a plan for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law. The process of developing the plan shall include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose. The plan shall be developed within 60 days from the date of this proclamation. After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan.[35]

Complying with Section 2 of the Proclamation, on June 11, 2021, the Department of Homeland Security announced that it had adopted a plan for redirecting the remaining border wall funds.[36] The Department of Homeland Security stated that it was legally required to use some of the appropriated funds and that it "will prioritize the remaining border barrier funds to address and remediate urgent life, safety, and environmental issues resulting from the previous administration's border wall construction."[37]

Homeland Security went on to announce that it had begun working on remediating the erosion created by the abandoned fence construction in San Diego and that the Department would prioritize funds for necessary clean-up of sites "including drainage, erosion control, site

---

[34] Id.

[35] Id.

[36] Press Release, Department of Homeland Security, DHS Releases Plan for Use of Border Barrier Funds (June 11, 2021), https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds.

[37] Id.

remediation, and material disposal," and that "[a]ppropriated funds may also be used for mitigating some environmental damage caused by border wall construction."[38]

So, far from prohibiting the relief Rancho Vista seeks, the Proclamation required—and the Department of Homeland Security has adopted—a plan to remedy the exact type of safety and environmental injuries Rancho Vista complains of in this case. Those injuries are, in short, redressable under the terms of the Proclamation itself.

### 1.2    The Department of Defense has independent border fence construction authority under 10 U.S.C. § 284

Separate and apart from the emergency authority invoked and then terminated by Presidential Proclamation under 10 U.S.C. § 2808, the Department of Defense has independent statutory authority under 10 U.S.C. § 284 to support other agencies, including Homeland Security and other law enforcement agencies, in the construction of border fences: "(a) The Secretary of Defense may provide support for the counterdrug activities or activities to counter transnational organized crime of any other department or agency of the Federal Government or of any State, local, tribal, or foreign law enforcement agency."[39] This authority includes: "(7) Construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."[40]

The Department of Defense's Section 284 authority, under which border wall construction was done prior to the President's Proclamation of emergency under 10 U.S.C. § 2808, is not mentioned in and is not affected by the Presidential Proclamation terminating that emergency. In the Memorandum for Secretaries of the Military Departments Acting Under Secretary of

---

[38] *Id.*
[39] 10 U.S.C. § 284 (b)(7).
[40] *Id.*

Defense, attached to the Government's Motion as Exhibit C, the Secretary of Defense admits that the Presidential Proclamation does not require cancellation of border wall construction contracts entered into under authority of section 284—that he or she is canceling those contracts as a matter of policy:

> Although not legally required by the termination of the national emergency at the southern border, canceling section 284 projects is consistent with the policy intent, described in Proclamation 10142, to end construction of a border wall. The Secretary of the Army, therefore, will take immediate action to cancel all section 284 construction projects.[41]

In addition, the Memorandum for the Chairman of the Joint Chiefs of Staff, attached to the Government's Motion as Exhibit B, concedes that the Department of Defense retains its authority, separate from the national emergency provisions of 10 U.S.C. § 2808, to support border wall construction:

> The termination of the national emergency eliminates the authority to issue orders for units and members under title 10, U.S. Code section 12303, but does not otherwise affect the authority to continue supporting the Department of Homeland Security at the southern border outside the framework of the terminated national emergency.
>
> * * *
>
> The Commander, U.S. Army Corps of Engineers, shall promptly seek direction from the Department of Homeland Security regarding the border barrier projects undertaken by the Department of Homeland Security for which the U.S. Army Corps of Engineers is the construction agent.[42]

The Government is, therefore, flat wrong when it argues that the Department of Defense is legally prohibited from taking action to redress Rancho Vista's injury. The Department of Defense retains ample statutory authority under 10 U.S.C. § 284 to complete necessary work on the Rancho Vista site. Congress granted that authority in 10 U.S.C. § 284, and it is unaffected by the Presidential

---

[41] Def.'s Mot. to Dismiss, Ex. C, Memorandum for Secretaries of the Military Departments Acting Under Secretary of Defense.

[42] Def.'s Mot. to Dismiss, Ex. B.

Proclamation. That is the authority the Department of Defense used before the emergency was proclaimed in 2019,[43] and it is the authority the Department still retains today after the termination of the emergency by the May 2021 Presidential Proclamation.

### 1.3    The Department of Homeland Security, too, has independent border fence construction authority

Under 8 U.S.C. § 1103(a)(5)[44], the Department of Homeland Security has "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens…" And under 6 U.S.C. § 211, responsibility for border security within the Department of Homeland Security is carried out by the United States Customs and Border Protection. The red line in the map on page 3 of the Government's Motion shows the portion of the wall that had been constructed under the authority of these two statutes before the 2019 Presidential Proclamation invoked the additional Defense Department emergency authority of 10 U.S.C. § 2808—the only authority revoked by the 2021 Presidential Proclamation.

Confirming the Department of Homeland Security's continuing power over border wall construction, on April 30, 2021, the Department of Defense transferred to Homeland Security all its authority to operate and maintain the border wall infrastructure, including any necessary further construction:

> I have informed the Secretary of Homeland Security that DoD will no longer undertake the construction of fences and roads and installation of lighting at the southern border pursuant to title 10 U.S. Code, section 284, and that consistent with previous approvals of section 284 construction, DHS will accept custody of border barrier infrastructure constructed pursuant to section 284, account for such infrastructure in its real property records, and operate and maintain the infrastructure (including any necessary further construction, consistent with applicable law).[45]

---

[43] Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019).
[44] 8 U.S.C § 1103(a)(5)
[45] Def.'s Mot. to Dismiss, Ex. C ()

A June 15, 2021, U.S. Government Accountability Office report, entitled "Office of Management and Budget and U.S. Department of Homeland Security—Pause of Border Barrier Construction and Obligations," explains the Department of Homeland Security's (D.H.S.) statutory authority for border wall construction:

> DHS has statutory authority to control and guard the borders of the United States.[46] Within D.H.S., responsibility for border security is carried out by the United States Customs and Border Protection (C.B.P.).[47] Under C.B.P.'s Border Wall System Program, it plans for and executes the deployment of barriers and other assets intended to prevent the illegal entry of people, drugs, and other contraband along the southern border.[48]

The Report stated that, for fiscal years 2018 through 2021, Congress had appropriated funds for border wall construction and that these appropriations remained available for five years (that is, to the present date). For fiscal years 2018, 2019, 2020, and 2021, the respective appropriation act designates a certain amount of funding from the PC&I lump sum that is specifically available for fencing or barrier systems. For example, for fiscal year 2019, of the $2.5 billion appropriated to C.B.P., $1.375 billion is available for border fencing.[49] Each year, the appropriations acts vary in the extent to which they include requirements regarding the design of fencing or barriers and/or the specific geographic areas along the southern border where fencing or barriers may be constructed.[50] Appropriations for border fencing or barriers are

---

[46] U.S. Gov't Accountability Off., GAO-B-333110, *Office of Management and Budget and U.S. Department of Homeland Security – Pause of Border Barrier Construction Obligation* 4 (2021).
[47] *Id*. citing 6 U.S.C. § 211.
[48] *Id. citing* U.S. Gov't Accountability Off., GAO-18-614, *Southwest Border Security: C.B.P. is Evaluating Designs and Locations for Border Barriers but Is Proceeding Without Key Information* (2018) and U.S. Gov't Accountability Off., GAO-21-175, *DHS Annual Assessment: Most Acquisition Programs Are Meeting Goals, but Data Provided to Congress Lacks Context Needed For Effective Oversight* (2021).
[49] GAO-B-333110 *supra* note 26 at 5 *citing* Pub. L. No. 116-6, § 230(a)(1).
[50] *Id.*

available for obligation for five fiscal years.[51] This means that these amounts can be used for needs that arise at any time during the five-year period of availability, consistent with the purposes of the appropriation.[52]

Specifically, Congress appropriated $1.3 billion for border wall construction to the Department of Homeland Security for fiscal year 2021. For fiscal year 2021, Homeland Security received $1.375 billion in appropriations for the construction of barrier systems along the southern border and has not yet obligated these funds.[53] Homeland Security explains that this funding will be obligated for new construction projects once statutory prerequisites have been satisfied.[54]

The Department of Homeland Security also stated its intent to use some of these appropriated funds for border wall construction:

> DHS states that some of its 2021 border barrier funding will be obligated for existing barrier construction projects once DHS has determined existing projects' needs. Specifically, DHS is reviewing existing projects, and will use some of its 2021 funding for projects previously constructed by D.O.D., for the costs associated with bringing D.H.S.'s existing projects into compliance with statutory requirements under environmental laws, and for stakeholder consultation. DHS asserts it has substantial discretion in determining the projects that will be funded with the 2021 appropriation.[55]

Because this independent border wall construction statutory authority under 8 U.S.C. § 1103 is unaffected by the 2021 Presidential Proclamation terminating the military's emergency authority under a completely different statute, the Government's argument that it is legally prohibited from redressing the dangerous conditions at the Rancho Vista construction site fails.

---

[51] *Id.* at 6.
[52] *Id.*
[53] GAO-B-333110 *supra* note 26 at 5 *citing* Pub. L. No. 116-6, § 230(a)(1).
[54] GAO-B-333110 *supra* note 26 at 1.
[55] *Id.* at 14.F

**2.      Rancho Vista's First Claim states a cognizable claim for relief from the Government's action that is destroying its property**

Contrary to the Government, Rancho Vista is entitled to judicial relief to remedy the ongoing destruction of its property, including its fragile and valuable endangered species habitat. The Administrative Procedure Act provides Rancho Vista a claim for relief as a party suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action. And, even if Rancho Vista did not state a claim under the Administrative Procedure Act, it is entitled to relief in a non-statutory action.

**2.1      Rancho Vista has stated a claim under the Administrative Procedure Act**

Rancho Vista has suffered a legal wrong from Government's construction of the border wall so as to daily channel scores of undocumented immigrants onto its property, causing the destruction of fragile and highly valuable endangered species habitat. Had the United States built a paved walkway directly onto Rancho Vista's property, it could not have provided a more direct structure for funneling these immigrants onto this valuable habitat, where they are intercepted by Border Patrol agents chasing them on all-terrain vehicles that tear up the soils and vegetation. Had the Government not constructed the wall for miles east and west of Rancho Vista's property, leaving only this single entrance to the United States, Rancho Vista would not be suffering this injury.

Because of this legal wrong, Rancho Vista is entitled to relief under the Administrative Procedure Act. Section 702 states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any

mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.[56]

As the Supreme Court held in the landmark case of *Citizens to Preserve Overton Park v. Volpe*:[57]

A threshold question--whether petitioners are entitled to any judicial review -- is easily answered. Section 701 of the Administrative Procedure Act, 5 U.S.C. §701 (1964 ed., Supp. V), provides that the action of "each authority of the Government of the United States," which includes the Department of Transportation, is subject to judicial review except where there is a statutory prohibition on review or where. "agency action is committed to agency discretion by law." In this case, there is no indication that Congress sought to prohibit judicial review, and there is most certainly no "showing of 'clear and convincing evidence' of a . . . legislative intent" to restrict access to judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967).[58]

Contrary to the Government, there is an applicable legal standard for this case found in the Fifth Amendment to the Constitution: "[N]or shall private property be taken for public use without just compensation."[59] The Supreme Court has held that a Fifth Amendment taking of property occurs where, as here, the Government has caused the condition—the unfinished gap in the fence—that funnels individuals to continuously pass over Rancho Vista's property:

In *Loretto* we observed that where governmental action results in "[a] permanent physical occupation" of the property, by the government itself or by others, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." We think a "permanent physical occupation" has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and for, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.[60]

---

[56] 5 U.S.C. § 702.
[57] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).
[58] *Id.* at 410, quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967).
[59] U.S. Const. amend. V, cl. 5.
[60] *Nollan v. California Coastal Com'n*, 483 U.S. 825, 831-32 (1987), quoting *Loretto*, 458 U.S. at 432–33, 434–35.

Recently, in *Cedar Point Nursery v. Hassid*,[61] the Supreme Court reaffirmed this

principle, stating "we have stated that the right to exclude is "universally held to be a

fundamental element of the property right,"[62] and is "one of the most essential sticks in the

bundle of rights that are commonly characterized as property."[63]

Denying the Government's motion to dismiss a taking claim resulting from the Border

Patrol's permanent occupancy of the plaintiff's property, the U.S. Court of Federal Claims

stated:

> When the Government physically takes possession of an interest in property for
> some public purpose, it has a categorical duty to compensate the former owner,
> regardless of whether the interest taken constitutes an entire parcel or merely a
> part thereof."). The creation of roads, the damage to property, or the harassment
> of people lawfully conducting their business also is relevant to the taking analysis
> in the present case. *See, e.g., John R. Sand & Gravel,* 457 F.3d at 1356 (finding
> government construction of a fence on plaintiff's property constituted accrual date
> of taking claim).[64]

Here, by funneling immigrants onto Rancho Vista's property, and directing Border Patrol

agents to intercept them there every night, the Government has taken an easement for ingress and

egress over Rancho Vista's property.[65] By causing physical destruction of the valuable

endangered species habitat that is a portion of Rancho Vista's land, the Government has taken

that portion in violation of the Fifth Amendment.

This Court has jurisdiction to declare the Government's action arbitrary and contrary to

law—specifically, the Fifth Amendment. As the Supreme Court held in *Eastern Enterprises v.*

---

[61]*Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063 (2021).

[62] *Id.* at 2072, quoting *Kaiser v. Aetna v. United States*, 444 U.S. 165, 176 (1979).

[63] *Cedar Point* at 2072, quoting *Kaiser Aetna* at 176, 179-80.

[64] *International Indus. Park, Inc. v. United States*, 80 Fed.Cl. 522 (Fed. Cl. 2008), quoting *Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132 (Fed. Cir. 2004).

[65] *See generally Kaiser Aetna* at 180.

*Apfel*,[66] and explained in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*,[67] the Declaratory Judgment Act "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."[68]

In addition, the Government's abandonment of the Rancho Vista site also violates the terms of the Presidential Proclamation itself, which states: "The Secretary of Defense and the Secretary of Homeland Security may make an exception to the pause, however, for urgent measures needed to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose."[69] Congress has appropriated funds to close the entrance onto Rancho vista's land, but the Government refuses to take this action. The Administrative Procedure Act authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed."[70]

## 2.2     Rancho Vista has also stated a non-statutory claim for relief

The D.C. Circuit has held that a plaintiff has a non-statutory claim for relief even where the complaint fails to state a claim under the Administrative Procedure Act. For example, in *Chamber of Commerce v. Reich*, [74 F.3d 1322 ], the plaintiff filed a challenge to an Executive Order authorizing the Secretary of Labor to disqualify employers who hire permanent replacement workers during a lawful strike by union workers.[71] The district court held that the plaintiff had no cause of action, but the Court of Appeals reversed, quoting the Supreme Court:

> [A]cts of all [federal department] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally

---

[66] *E. Enters. v. Apfel*, 524  U.S. 498 (1998).

[67] *Duke Power Company v. Carolina Environmental Study* Group, 438 U.S. 59 (1978).

[68] *Id*. at 71 n. 15.

[69] Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021).

[70] 5 U.S.C. § 706(1).

[71] *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996)

have jurisdiction to grant relief…Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.[72]

Holding that the lack of a claim under the Administrative Procedure Act did not affect the separate right to non-statutory review under federal question jurisdiction, the D.C. Circuit explained:

> [W]e have never held that a lack of a statutory cause of action is *per se* a bar to judicial review. *See, e.g., Five Flags Pipe Line Co. v. Department of Transp.,* 854 F.2d 1438, 1439 (D.C.Cir.1988) ("If Congress makes no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable to it, then an aggrieved person may get 'non-statutory review' . . . in federal district court pursuant to the general 'federal question' jurisdiction of that court.") (citation omitted); *A.F.L.– C.I.O. v. Kahn,* 618 F.2d 784, 787–93, 796 (D.C.Cir.) (en banc) (reviewing Procurement Act and NLRA claims without explicitly considering the cause of action), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979); *National Ass'n of Postal Supervisors v. United States Postal Service,* 602 F.2d 420, 432 (D.C.Cir.1979) (non-statutory review of whether agency exceeded its delegated authority); *Jordan v. United Ins. Co.,* 289 F.2d 778, 782–83 (D.C.Cir.1961) (permitting non-statutory review by the district court of administrative action). That the "executives" action here is essentially that of the President does not insulate the entire executive branch from judicial review. We think it is now well established that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin,* 505 U.S. at 815, 112 S.Ct. at 2790 (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this "does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David,* 448 F.2d 1067, 1072 n. 12 (D.C.Cir.1971).[73]

In addition to the Court's power to grant an injunction, the Declaratory Judgment Act[74] provides authority for this Court to declare a Government action unlawful:

---

[72] *Id.* at 1327, quoting *American School of Magnetic Healing v. McAnnulty* 187 U.S. 94, 108, 118 (1902).
[73] *Chamber of Commerce v. Reich*, 74 F. 3d at 1328.
[74] 28 U.S.C. § 2201.

(a) In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.[75]

According to the Advisory Committee Notes on Federal Rule of Civil Procedure No. 57,

Declaratory Judgment:

A declaratory judgment is appropriate when it will "terminate the controversy" giving rise to the proceeding. Inasmuch as it often involves only an issue of law on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion…

The "controversy" must necessarily be "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts."  *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325, 56 S. Ct. 466, 473, 80 L. Ed. 688, 699 (1936). The existence or nonexistence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status, may be declared. The petitioner must have a practical interest in the declaration sought, and all parties having an interest therein or adversely affected must be made parties or be cited.[76]

Supporting Rancho Vista's right to a declaration that the Government's actions have violated Rancho Vista's Fifth Amendment rights is a legal memorandum published by Counsel for the Border Patrol's San Diego Sector.[77] Defining the limits of the Border Patrol's right to occupy private property along the Mexican border, the memorandum states:

[A]fter all methods of persuasion have failed including efforts by personal interview and the placing of the landowner on notice of the law by registered mail, officers may gain access; to areas within the 25-mile area by the most expeditious means, if absolutely necessary. This is an extreme measure and is to be resorted to only in the direction of a supervisory officer after careful consideration. The fences and gates should be immediately repaired and precautions taken to avoid damage to the property."[78]

---

[75] 28 U.S.C. § 2201(a).
[76] Fed. R. Civ. P. 57, Advisory Cmte. on Rules (1937).
[77] P.X. 36 at DHS12176–78.
[78] P.X. 36 at DHS12176–78.

Nor are the San Diego Border Patrol agents authorized to change the condition of private

land:

> It is important to note that the authority to access border lands does *not* authorize
> Agents to do things which change the condition of private land, or which affects
> the value of private land. If Border Patrol access includes any digging, grading,
> building for construction of any kind, we must generally negotiate a lease, land
> use agreement, or some other form of permission from the landowner prior to
> beginning any construction project.[79]

Rancho Vista has stated a justiciable claim that the Government's actions amount to an

ongoing taking of private property for public use without just compensation, in violation of the

Fifth Amendment. So, even if Rancho Vista had not stated a cognizable claim under the

Administrative Procedure Act, which it believes it has, Rancho Vista has stated a cognizable

claim for non-statutory review and should not be dismissed.

## 3.    Section 2808 was not operative after January 20, 2021, and did not exempt the Government's action from NEPA and Endangered Species Act requirements

Rancho Vista's Second and Third Claims state causes of action based on the National

Environmental Policy Act (NEPA)[80] and the Endangered Species Act (ESA),[81] respectively. The

emergency provisions of 10 USC § 2808, including any exemption from the requirements of

NEPA and the Endangered Species Act, terminated on January 20, 2021, the day President Biden

issued his Presidential Proclamation ending the national emergency at the southern border.[82] The

Government's subsequent abandonment of the Rancho Vista construction site caused (and

continues to cause) significant impacts on the human environment without NEPA compliance,

and destruction of critical endangered species habitat, in violation of the Endangered Species

Act. Rancho Vista's Second and Third Claims for Relief, therefore, state a cause of action.

---

[79] *Id.*
[80] 42 U.S.C. §§ 4321 *et seq.*
[81] 16 U.S.C. §§ 1531-1544.
[82] Def.'s Mot. to Dismiss at 12.

### 3.1 Any NEPA or Endangered Species Act exemption terminated on January 20, 2021

The Government cites no authority for its argument that 10 U.S.C. § 2808 exempts border wall construction from compliance with environmental protection statutes like NEPA and the Endangered Species Act. The Department of Homeland Security's own press release indicates that it is using funds to mitigate environmental damage caused by border wall construction and that the Government will engage in "comprehensive review[s] that include[] detailed environmental impact analysis and remediation."[83]

But assuming the statute had exempted compliance with NEPA or the Endangered Species Act during the emergency, the termination of the emergency by Presidential Proclamation on January 20, 2021, also terminated the exemption. As the Government admits, the January 20, 2021, Presidential Proclamation terminated the Government's authority under the emergency statute, 10 USC § 2808. After that date, the *non-obstante* clause, exempting Government actions from some statutory requirements, terminated. The Government's argument that the statutory exemption continued after the statutory authority was terminated is inconsistent with both the Presidential Proclamation and the statute itself.

In his Proclamation, the President "hereby declare[d] that the national emergency declared by Proclamation 9844 and continued February 13, 2020 (85 Fed. Reg. 8715), and January 15, 2021, is terminated and that the authorities invoked in that proclamation will no longer be used to construct a wall at the southern border. And Subsection (f)of 10 U.S.C. 2808, titled "TERMINATION OF AUTHORITY," provides: "The authority described in subsection

---

[83] *See* DHS Press Release *supra* note 10.

(a) shall terminate with respect to any war or national emergency at the end of the war or national emergency."[84]

The Government's actions taken at the Rancho Vista site after January 20, 2021, were not (and could not have been) authorized by 10 U.S.C. § 2808, which had terminated. So, whatever *non-obstante* clause force that statute may have had, it was not in force at the time of the events giving rise to this suit.

### 3.2    NEPA applies to the Government's actions to create and maintain a border gap to channel immigrants onto Rancho Vista's property

The National Environmental Policy Act ("NEPA") requires "the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions."[85] Congress enacted NEPA in 1969 to serve as our "basic national charter for the protection of the environment."[86] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences."[87]

This "hard look" means federal agencies must consider "any adverse environmental effects which cannot be avoided."[88] NEPA thus requires agencies to "identify and develop methods and procedures . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations."[89]

---

[84] 10 U.S.C. § 2808(f).
[85] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[86] 40 C.F.R. § 1500.1(a)
[87] *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).
[88] 42 U.S.C. § 4332(C)(ii).
[89] 42 U.S.C. § 4332(B).

The Government's argument that it is merely maintaining the environmental status quo fails because, prior to the Proclamation, immigrants were not being channeled onto Rancho Vista's property. The Government's border wall construction created a single entrance to the United States for many miles, which altered the environmental status quo. This is unlike the situation in *Arizona v. Mayorkas*.[90]

The Government erroneously argues that by abandoning the construction site in its dangerous and destructive condition, it is merely maintaining the environmental status quo. But, as the declaration of David Wick states, environmental conditions on the property are being changed daily by erosion and trampling of the fragile endangered species habitat, immigrants are being injured by the dangers on the construction site, and the value of the land is being lost--all as a result of the Government's border wall activity.[91] This is very different from the situation in *Arizona v. Mayorkas*, where the many miles of border were left in the same environmental condition, untouched by Government action.[92]

### 3.3 The Government's construction of an opening in the border fence to channel immigrants adversely affects endangered species habitat

The Supreme Court has described the Endangered Species Act as the most comprehensive legislation for the preservation of endangered species ever enacted by any nation. Its stated purposes were "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved,"[93] and "to provide a program for the

---

[90] *Arizona v. Mayorkas*, 2022 WL 357348 (D.Ariz. 2022) at 13, citing *National Wildlife Federation v. Epsy*.

[91] *See* Pl.'s Ex. 1.

[92] *Id.*

[93] 16 U.S.C § 1531(b) (1976 ed.).

conservation of such . . . species . . . ."[94] In furtherance of these goals, Congress expressly stated in § 2(c) that "all Federal departments and agencies shall seek to conserve endangered species and threatened species . . . ."[95] Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined "conserve" as meaning "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."[96]

The Supreme Court has concluded that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[97] Specifically applicable here, Section 7(a) of the ESA requires:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species…[98]

Following this consultation, "the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[99]

Having constructed an entrance that channels hundreds of immigrants onto the fragile habitat of the burrowing owl and other endangered species, the Government's abandonment of the unfinished construction site creates a condition—the channeling of human traffic over the critical habitat area—that did not exist before (and was presumably never intended). This new

---

[94] 16 U.S.C. § 1531(b) (1976 ed.).
[95] 16 U.S.C. § 1531(c) (1976 ed.).
[96] 16 U.S.C. § 1532(2).
[97] *Tennessee Valley Auth. V. Hill*, 437 US 153, 184 (1978).
[98] 16 U.S.C. § 1536(a)(2).
[99] 16 U.S.C. § 1536(b)(3)(A).

condition—the channeling of hundreds of feet each night over the critical habitat—is an action requiring consultation under ESA. While the Government asserts that the decision to cease construction is an inaction, the Government took an affirmative action by terminating the contracts with the contractors, who then ceased construction and left materials and equipment on Rancho Vista's land. The failure to complete the border is not the action that should have triggered section 7—it was the termination of the contract.

The ESA defines action as "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[100]  When Congress defined agency action, they intended that it have a broad definition.[101] And courts have found agency action when an agency affirmatively authorizes an underlying activity and when the agency "ha[s] some discretion to influence or change the activity for the benefit of a protected species."[102] Here, the Government took an affirmative action in terminating the contract to continue building the fence. The Government had authority to continue the project, evidenced by the Presidential Proclamation and federal statutes, and could have completed the project. The termination directly and indirectly modified the land because it led to hundreds of migrants finding this one gap in miles and miles of border fence and trampling over the ground, injuring the habitats and the species that live within it.

This high volume of human traffic injured, and continues to injure, habitats and various species. Portions of Rancho Vista's property are non-native grasslands, coastal wetland habitats,

---

[100] 50 C.F.R. § 402.02.

[101] *See Ecological Rights Foundation v. FEMA*, 384 F.Supp.3d 1111, 1020 (N.D. Cal. 2019), citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F3d 1006, 1020 (9th Cir. 2012).

[102] *Id.* at 1021.

seasonal wetlands, and veral pool habitats, and these areas hold designations from local and state organizations.[103] The property is home to 85 species that are protected by the San Diego County Multiple Species. Parts of the land are designated critical habitats for the Quino checkerspot butterfly, the San Diego fairy shrimp, the Riverside fairy shrimp, the coastal California gnatcatcher, and the least Bell's vireo.[104] Without action taken, these habitats and species will continue to be threatened by the high volume of human traffic, which is a direct result of the Government's actions.

**4.      Rancho Vista was not required to give the Agency a 60-day notice**

The Government incorrectly argues that the 60-day notice requirement in the citizens suit provision of the Endangered Species Act (E.S.A.) applies to the third claim set forth in the complaint, which alleges that the Government violated the A.P.A. by failing to consult under Section 7 of the E.S.A.[105] But by its terms, the citizen suit provision applies only to three instances, none of which are applicable here:

> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or
>
> (B) to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State;
>
> (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.[106]

---

[103] Pl.'s Compl. At 2.
[104] *Id.*
[105] Compl. ¶ 25 (Jan. 20, 2022)(E.C.F. No. 1).
[106] 16 U.S.C. § 1540(g)(1).

Here, Rancho Vista does not seek to enjoin future behavior but instead asks for an order "holding unlawful and setting aside Defendants' decisions to cease all work on the border fence segment adjacent to Rancho Vista's property"[107] and "requiring Defendants to secure and finish the site in a workmanlike manner, including closing the gap in the fence, stabilizing the soils, cleaning up the site and removing all unused materials and waste on site . . ."[108] This claim is based on the Government's failure to consider the impacts its decision to abandon border fence construction would have on the designated habitat and the several endangered species, as the complaint alleges:

> In making the decision to order its contractors to abandon the border fence construction site adjacent to Rancho Vista's property, without closing the gap or cleaning up and finishing the site in a workmanlike manner, Defendants took a federal action that may affect the populations of endangered species, including the destruction of their habitat, located on and near Rancho Vista's property. Defendants took this action without considering the effects it may have on these populations of endangered species or their habitat and without consulting with the United States Fish and Wildlife Service, in violation of the Section 7 consultation requirement.[109]

Since the remedy that Rancho Vista seeks, in this case, is not available under the citizen suit provision of the Endangered Species Act, Rancho Vista's claim is not subject to any notice provision. As the Supreme Court held in *Bennett v. Spear*, a suit to set aside an agency decision for failure to consult lies within the purview of the Administrative Procedure Act and not the citizen suit provision of the Endangered Species Act.[110]

The Government cites no authority from this Circuit supporting its contention that Rancho Vista was required to give a 60-day notice, and the cases the Government does cite all involve remedies sought under the citizens' suit provision—and not under the Administrative

---

[107] Compl. at 9 (Jan. 20, 2022)(E.C.F. No. 1).

[108] *Id*. at 10.

[109] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

[110] *Bennett* at 157 to 179.

Procedure Act as this case is. In *Cary v. Hall*,[111] the plaintiff sought to enjoin enforcement of a newly promulgated regulation under the citizens' suit provision, and unsurprisingly, the district court of California held that the plaintiff was required to give a 60-day notice of the claim prior to the filing of the lawsuit. In *Safari Club Int'l v. Jewell*,[112] the plaintiff sought to challenge a listing exemption—relief specifically provided under the citizens' suit provision--and again, the court held that a 60-day notice was required for the citizens suit claim. In *Conservation Law Found. v. Ross*,[113] the court did not even address the 60-notice requirement. Finally, in *Bosworth*, the court held that judicial review of agency actions under the Endangered Species Act is governed by the Administrative Procedure Act, just like this case.[114]

**Conclusion**

Rancho Vista asks the Court to deny the Government's Motion to Dismiss. If, however, the Court is inclined to grant any part of the Government's Motion to Dismiss, Rancho Vista asks that it be allowed to amend its complaint, consistent with rulings holding that leave should be granted to amend.[115]

Dated: June 14, 2022                                 Respectfully submitted,

                                                    s/Nancie G. Marzulla
                                                    Nancie G. Marzulla (D.C. Bar No. 400985)
                                                    Roger J. Marzulla (D.C. Bar No. 394907)
                                                    Marzulla Law, LLC
                                                    1150 Connecticut Ave NW,

---

[111] *Cary v. Hall*, 2006 WL 6198320 (N.D.Cal. 2006).

[112] *Safari Club Int'l v. Jewell*, 960 F.Supp.2d 17, 58-9 (D.D.C. 2013).

[113] *Conservation Law Found. v. Ross*, 422 F.Supp.3d 12, 16 (D.D.C. 2019).

[114] *See Wyoming Outdoor Council v. Bosworth*, 284 F.Supp.3d 81, 81 (2003).

[115] For example, in *Forman v. Davis*, the Supreme Court reversed the denial of a plaintiff's motion to amend a complaint after the trial court found that it had failed to state a claim, explaining that cases should be decided on the merits, not mere technicalities of pleadings. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com

Counsel for Plaintiff