**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RANCHO VISTA DEL MAR, *Plaintiff*, v. UNITED STATES OF AMERICA *et al.*, *Defendants*. | No. 22-cv-141 (DLF) |

**MEMORANDUM OPINION**

Rancho Vista del Mar, a corporation that owns nearly 500 acres of land adjacent to the Mexican border in San Diego County, brings this suit against the United States, the Department of Homeland Security (DHS) and its Secretary, and the Chief Patrol Agent for the San Diego Sector of Customs and Border Protection (CBP).  *See* Compl. ¶¶ 1–5, Dkt. 1.  Rancho Vista alleges that the government's decision "to terminate the construction contracts and abandon work on the partially finished border fence" adjacent to Rancho Vista's property violated the Administrative Procedure Act, the National Environmental Policy Act, and the Endangered Species Act.  *Id.* at 1; *see also id.* ¶¶ 16, 17, 21.  Before the Court is the defendants' Motion to Dismiss, Dkt. 12.  For the reasons that follow, the Court will grant the motion.

I.      **BACKGROUND**

A.      **Statutory Framework**

The APA permits judicial review of "final agency action" unless it "is committed to agency discretion by law" or a "statute preclude[s] judicial review."  5 U.S.C. §§ 701(a), 704.  It empowers the Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  In an arbitrary and

capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

The National Environmental Policy Act (NEPA) "establishes procedural requirements to ensure that the government gives 'appropriate consideration' to environmental impacts before undertaking major actions." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (quoting 42 U.S.C. § 4332(2)(B)–(C)). Among other things, it requires the agency "to take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action" and to "consider alternatives to the proposed action." *Id.* (quotation marks omitted). The agency must prepare and publish an environmental impact statement to that effect. *See* 42 U.S.C. § 4332(C); *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1055 (D.C. Cir. 2017). The statute is a procedural one, "designed to ensure fully informed and well-considered decision[s] by federal agencies," and it "does not mandate particular results." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (quotation marks omitted).

The Endangered Species Act (ESA) likewise imposes requirements on federal agencies before taking certain actions. *See* 16 U.S.C. § 1531 *et seq.* For instance, "[i]f an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the [National Marine Fisheries Service] or Fish and Wildlife [Service]." *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 474–75 (D.C. Cir. 2009) (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13, 402. 14). "If the agency determines that its action will not affect any listed species or critical habitat, however, then it is not required to consult with [National Marine Fisheries] or Fish and Wildlife." *Id.* at 475.

2

B.      **Factual Background**[1]

In February 2019, former President Trump declared a national emergency requiring the use of armed forces at the southern border of the United States.  Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019).  In that proclamation, the President "invoked and made available" to the Secretary of Defense a statutory authority applicable during national emergencies requiring armed forces.  *Id.* (citing 10 U.S.C. § 2808).  That statute, in turn, allows "the Secretary of Defense, without regard to any other provision of law," to "undertake military construction projects" necessary to help address the emergency.  10 U.S.C. § 2808(a).

Invoking § 2808 authority, the Secretary of Defense then "determined that 11 military construction projects along the international border with Mexico" were "necessary to support the use of the armed forces in connection with the national emergency."  Memorandum from Mark Esper, Secretary of Defense, to Secretaries of the Military Departments, et al., *Guidance for Undertaking Military Construction Projects Pursuant to Section 2808 of Title 10, U.S. Code* (Sept. 3, 2019) at 1, Defs.' Mot. Ex. A, Dkt. 12-1 (Sec'y of Def. Mem.).  One of those projects was "San

---

[1] The Court accepts the facts alleged in the complaint "as true and draw[s] all reasonable inferences from those allegations" in Rancho Vista's favor.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  The Court also considers materials attached to the complaint, documents incorporated by reference, and judicially noticeable materials, including government records.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (holding that public records, including agency documents, are "subject to judicial notice on a motion to dismiss"); *see also Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 63 n.2 (D.D.C. 2019) (explaining that "judicial notice may be taken of government documents available from reliable sources," including an executive memorandum); *Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."); *Herron v. Fannie Mae*, No. 10-cv-943, 2012 WL 13042852, at *1–2 (D.D.C. Mar. 28, 2012) ("[P]ublic records of federal agencies are a proper subject of judicial notice.").

Diego Project 4," which planned for the Secretary of the Army to construct 1.5 miles of border fence in the Otay Mesa area of California. *See id.*, Attach.

The Department of Defense (DOD) sought a strip of land owned by Rancho Vista on which to build that fence. Compl. ¶ 9. On March 21, 2019, Rancho Vista deeded approximately seventeen acres to the United States, while retaining nearly 500 adjacent acres. *Id.* ¶¶ 8–9. About a year later, in March 2020, DOD began San Diego Project 4.[2] *Id.* ¶ 10. The Secretary authorized construction to begin "without regard to" the NEPA or the ESA. Sec'y of Def. Mem. at 1. Over the next several months, government contractors extensively graded and excavated the land, poured concrete foundations, installed steel bollards, and completed portions of the fence. Compl. ¶¶ 10–11.

After taking office, President Biden terminated the national emergency at the southern border. *Id.* ¶ 12 (citing Pres. Proc. No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021)). The President declared that "the authorities invoked in [the February 2019] proclamation will no longer be used to construct a wall at the southern border." Pres. Proc. No. 10142. He directed the DOD and DHS Secretaries to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of this proclamation." *Id.* § 1(a)(i).

Following President Biden's declaration, DOD immediately directed "all border barrier military construction projects" authorized by § 2808's emergency authority to be "pause[d]," no new contracts awarded, and no new expenses incurred. Memorandum from David Norquist,

---

[2] Rancho Vista's complaint alleges that the defendants—which include the United States, DHS, and CBP (a component of DHS)—were responsible for constructing this portion of fence. *See, e.g.*, *id.* ¶ 10. The Court takes judicial notice of the fact that this portion of fence was being constructed by DOD, not DHS or CBP. *See* Sec'y of Def. Mem., Attach.

Deputy Secretary of Defense, to Chairman of the Joint Chiefs of Staff, et al., *Department of Defense Actions Regarding the Proclamation of January 20, 2021* (Jan. 23, 2021) at 2, Defs.' Mot. Ex. B, Dkt. 12-2 (First Deputy Sec'y of Def. Mem.).   The Deputy Secretary subsequently instructed the Secretary of the Army to "take immediate action to . . . cancel all section 2808 border barrier construction projects" on April 30, 2021.   Memorandum from Kathleen Hicks, Deputy Secretary of Defense, to Secretary of the Army, et al., *Department of Defense Actions Implementing Presidential Proclamation 10142* (Apr. 30, 2021) at 1, Defs.' Mot. Ex. C, Dkt. 12-3 (Second Deputy Sec'y of Def. Mem.).   This included all of the eleven projects laid out in the earlier memorandum, including San Diego Project 4.   *See* First Deputy Sec'y of Def. Mem. at 2.

Accordingly, government contractors were instructed to cease all work on the portion of the border fence next to Rancho Vista's property.   Compl. ¶ 13.   At that point, though portions of the fence were already erected, a 700-foot gap remained.   *Id.* ¶ 11.   The contractors left the site uncleaned, partially excavated, and with both installed and uninstalled materials left behind.   *Id.* According to Rancho Vista, the abandonment of the construction site "has caused erosion, desedimentation, destruction of habitat, and threatened the continued existence of endangered species on and near Rancho Vista's property," *id.* ¶ 15, part of which is designated as critical habitat for several endangered species, *id.* ¶ 1.   In addition, because several miles of fence were constructed on either end, the 700-foot gap continuously "channels illegal immigrants crossing the border from Mexico" directly onto Rancho Vista's property.   *Id.* ¶ 13.

### C.    Procedural History

Rancho Vista brought suit on January 20, 2022.   It first alleges that the government's decision to order contractors to stop all work on the fence bordering Rancho Vista's property was arbitrary, capricious, and contrary to law, in violation of the Administrative Procedure Act (APA).

*Id.* ¶ 16.  It also claims that the government abandoned the site without following the procedures required by the NEPA and the ESA.  *Id.* ¶¶ 19, 25.  Rancho Vista asks the Court to hold unlawful and set aside the government's decision to cease all construction on the fence bordering its property, *id.* at 9, and to order the government to finish and clean up the construction site, *id.* at 10.

The government moved to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that Rancho Vista lacks Article III standing.  *See* Defs.' Mot. at 12–17, 26–31.  It alternatively moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted under any of the three statutes.  *See id.* at 17–26.

## II.   LEGAL STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).  When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions."  *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation marks and citations omitted).  But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" to "assure itself of its own subject matter jurisdiction."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quotation marks omitted).  A court that lacks jurisdiction must dismiss the action.  Fed. R. Civ. P. 12(b)(1), (h)(3).

Rule 12(b)(6) allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's well-pleaded factual allegations are "entitled to [an] assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation marks omitted).  A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.   ANALYSIS

### A.  Article III Standing

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  "[T]here is no justiciable case or controversy unless the plaintiff has standing." *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).  As the Supreme Court has interpreted this requirement, "the irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). "The burden of establishing these elements falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, 828

F.3d 989, 992 (D.C. Cir. 2016).  The plaintiff "must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

As to the first requirement, Rancho Vita has alleged a sufficient injury-in-fact.  Rancho Vista alleges that the land "on and near [its] property" has been "le[ft] open to environmental destruction," including through "erosion, desedimentation, destruction of habitat, and [a] threat [to] the continued existence of endangered species."  Compl. ¶¶ 13, 15.  In addition, it alleges that "hundreds" of "undocumented immigrants" each night "pass through the gap . . . in the fence[] and stream across Rancho Vista's property," also fueling the environmental destruction.  *Id.* ¶ 13. These injuries are concrete, particular to Rancho Vista, and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61; *see also Tex. Gen. Land Off. v. Biden*, No. 7:21-cv-000420, 2022 WL 3086333, at *3–4 (S.D. Tex. Aug. 3, 2022) (concluding that a landowner adjacent to the border had standing to challenge border wall gaps based on similar injuries).

Contrary to the government's assertion, these injuries-in-fact suffice to sustain Rancho Vista's ESA claim.  *See* Defs.' Mot. at 26.  It is true that "[t]he relevant showing for Article III standing . . . is not injury to the environment but injury to the plaintiff."  *Laidlaw*, 528 U.S. at 169. But this does not impose a higher standard for ESA injury than other contexts; it simply means that general allegations of remote environmental threats are not sufficiently particular or imminent to confer standing.  *See Lujan*, 504 U.S. at 563–67 (no standing for ESA claim where plaintiffs had no "concrete plans" to visit threatened areas); *Pub. Emps. for Env't Resp. v. Bernhardt*, No. 18-cv-1547, 2020 WL 601783, at *6 (D.D.C. Feb. 7, 2020) (no standing for ESA claim where plaintiffs alleged "interest only in [a region] generally, without identifying portions of [it] that they use . . . designated as critical habitat").  That is not the case here, as Rancho Vista *owns* the critical

habitat allegedly being destroyed.  Compl. ¶¶ 1, 25; *Mass. Coal. For Immigration Reform v. DHS*, No. 1:20-cv-3438, 2022 WL 3277349, at *4–5 (D.D.C. Aug. 11, 2022) (standing for NEPA challenge to halted border wall where plaintiff alleged that "trespassers on and around his land" near the southern border "impaired his enjoyment" of and "harmed his ranch and the surrounding environment"); *cf. Otay Mesa Prop., L.P. v. Dep't of Interior*, 144 F. Supp. 3d 35, 57–58 (D.D.C. 2015) (Jackson, J.) (holding that Rancho Vista had injury-in-fact to challenge designation of its property as critical habitat).

The second standing requirement, traceability, is not contested.  Crediting Rancho Vista's injury as true, that injury was caused by DOD abandoning its ongoing construction of the San Diego Project 4 fence near Rancho Vista's land.[3]  Compl. ¶¶ 13, 15.  Furthermore, the continuing injury is also traceable to the government's subsequent decisions not to clean up the construction site or close the fence gap.  *See id.* ¶ 16.

The government does challenge Rancho Vista's standing on the third prong: redressability.  "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (footnote omitted).  Rancho Vista seeks two substantive forms of relief: (1) "an order holding unlawful and setting aside [the government's] decision to cease all work on the border fence segment adjacent to Rancho Vista's property," and (2) "an order requiring [the government] to secure and finish the site in a workmanlike manner."

---

[3] The Court notes that DOD was not named specifically as a defendant, but this poses no traceability issue.  The injury is traceable at least to the United States government generally— which *is* named as a defendant, as is allowed for APA challenges to agency action.  *See* 5 U.S.C. § 703 (APA actions "may be brought against the United States").

Compl. at 9–10, Prayer for Relief ¶¶ 1–2.[4]  The requested relief, if granted, would likely redress Rancho Vista's alleged injury.  Rancho Vista states that the ongoing environmental destruction and immigrant foot traffic stem from the unfinished construction site; it follows that vacating the government's decision to halt the project and/or ordering it to finish would alleviate that harm.

The government's objections to each form of relief are both unavailing.  First, the government claims that ordering it to complete construction would be beyond the Court's power. Defs.' Mot. at 14 n.6.  "But the redressability prong of the standing test is not an inquiry into the scope of the court's power to grant relief" and "does not ask whether it is likely that the court's determination would provide the ultimate relief sought."  *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989) (quotation marks omitted).  "Rather, the test assumes that a decision on the merits would be favorable and that the requested relief would be granted; it then goes on to ask whether that relief would be likely to redress the party's injury."  *Id.* (emphasis omitted).  Therefore, as in *Thornburgh*, the Court will "examine below the [government's] assertion that no relief is available in this case; [it] decline[s], however, to conduct that analysis under the rubric of standing doctrine." *Id.*

Second, the government argues that a vacate-and-remand order will not redress Rancho Vista's injuries because DOD is incapable of making a different decision on remand, since President Biden's declaration terminated its § 2808 construction authority.  Defs.' Mot. at 14.  But this argument requires the Court to assume that Rancho Vista will lose on the merits.  Rancho Vista asserts that the agencies *could* finish construction under exceptions to the presidential declaration or other statutory authorities, and not doing so was arbitrary and capricious.  Which

---

[4] Rancho Vista also seeks attorneys' fees and costs, *id.* ¶ 3, and any other relief the Court deems just, *id.* ¶ 4.

party has the better argument is again an analysis for the merits phase.  At this point, the Court must "assume that on the merits the plaintiffs would be successful in their claims."  *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff.").  And assuming Rancho Vista is right that it was arbitrary and capricious for the government to leave the construction site unfinished, then vacating and remanding that decision could redress Rancho Vista's injuries.[5]  Since Rancho Vista has "clear[ed] th[e] comparatively low bar" to plausibly allege standing at the motion to dismiss phase, *Mass. Coal.*, 2022 WL 3277349, at *6, the Court turns to the merits of its claims.

**B.  APA Claim**

In an arbitrary and capricious challenge, the Court "is not to substitute its judgment for that of the agency," and it "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *State Farm*, 463 U.S. at 43 (quotation marks omitted).  An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  "The party challenging an agency's action as arbitrary and capricious bears the burden of proof."  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

---

[5] Though the parties do not address the redressability of Rancho Vista's procedural injuries under the ESA or the NEPA, any doubt may be put to rest, for "the plaintiff in a procedural-injury case is relieved of having to show that proper procedures would have caused the agency to take a different action."  *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (cleaned up).

Rancho Vista claims that the government's decision to halt construction on the fence near its property and to "leave th[e] site in its unfinished condition" was arbitrary and capricious. Compl. ¶ 16.  That contention lacks merit.  The agency responsible for that decision followed an unambiguous statutory and executive command, and thus its actions cannot be considered arbitrary or capricious.[6]

Although the complaint obscures this fact, DOD constructed the portion of the border fence adjacent to Rancho Vista's property as part of San Diego Project 4.  Sec'y of Def. Mem., Attach. That project was explicitly premised on DOD's § 2808 emergency construction authority.  *Id.* at 1.  By that statute's very terms, such authority is only available during "the declaration by the President of a national emergency."  10 U.S.C. § 2808(a).  The decision to end a national emergency belongs to the president, not an agency.  And when the emergency ends, § 2808 leaves no room for agency discretion, nor does it specify any factors that the Secretary must consider in deciding whether to terminate a construction project.  *Cf. State Farm*, 463 U.S. at 43 (explaining that an agency decision that fails to consider "relevant factors" or "has relied on factors which Congress has not intended it to consider" may be arbitrary and capricious).  Rather, § 2808 simply provides that the emergency construction authority "shall terminate" at the end of the emergency. 10 U.S.C. § 2808(f).

---

[6] The parties disagree about the legal standard relevant to this claim, with the government claiming that Rancho Vista cannot bring a "freestanding" APA claim untethered to substantive guideposts, Defs.' Mot. at 17–18, and Rancho Vista responding that its APA claim is based on the Fifth Amendment Takings Clause, Pl.'s Resp. at 16–17, Dkt. 15.  Neither approach is appropriate.  First, the APA claim is not "freestanding," as can be analyzed in relation to § 2808 and other statutes relevant to border fence construction.  And second, Rancho Vista did not plead a takings claim in its complaint, so the Court will not consider it now either under the APA or Rancho Vista's non-statutory theory, *see* Pl.'s Resp. at 18–21.

In this case, when DOD halted its § 2808 border fence projects—including the portion adjacent to Rancho Vista's land—it explained that it no longer had authority to continue them. *See* First Deputy Sec'y of Def. Mem. at 1–2 (explaining that "the President terminated the national emergency with respect to the southern border . . . and the authorities based on that emergency," and so the "Army Corps of Engineers [shall] take immediate action to pause work on all border barrier military construction projects authorized by [§] 2808"). That decision tracked § 2808(f)'s command. Accordingly, it was not arbitrary or capricious.

Rancho Vista does not challenge the President's decision to end the national emergency. Nor does it dispute that the President's decision terminated DOD's § 2808 authority to continue San Diego Project 4. *See* Pl.'s Resp. at 1, 6. It claims to challenge instead the Army Corps of Engineers' May 1, 2021 order directing federal contractors to "stop all work" on San Diego Project 4. *See id.* (citing Letter from CJW Joint Venture to Rancho Vista del Mar (May 28, 2021), *id.* Ex. 2). But this distinction is one without a difference. The Army Corps of Engineers' order came a single day after the Deputy Secretary ordered all § 2808 border construction projects immediately canceled—explicitly because "the termination of the national emergency with respect to the southern border in Proclamation 10142 made the authority provided in section 2808 no longer available." Second Deputy Sec'y of Def. Mem. at 1. That the Army Corps of Engineers' order was issued three months after the presidential proclamation does not mean the two were unrelated, as Rancho Vista appears to suggest, *see* Pl.'s Resp. at 1.

Further, Rancho Vista's assertion that the presidential proclamation did not compel the stop-work order is similarly unpersuasive. It argues that the proclamation cannot alone halt all border fence construction and, even if it could, it included an "exception to the pause" in border wall projects "for urgent measures needed to avert immediate physical dangers." Pl.'s Resp. at 18

(quoting 86 Fed. Reg. 7225).  Both are beside the point.  The only effect of the proclamation relevant here is that it terminated the national emergency and thus the § 2808 authority used to construct the fence up until that date.  Rancho Vista concedes that both terminations were lawful.  *See id.* at 8.  DOD's decision to halt construction under § 2808 was thus not arbitrary, but mandatory.  For this case, that ends the matter, and there is no need to inquire into the proclamation's effect on other border fence projects based on other statutory authorities.

Rancho Vista suggests that DOD or DHS should have invoked a different statutory authority to finish the project.  Pl.'s Resp. at 10–14 (citing 10 U.S.C. § 284 (DOD); 8 U.S.C. § 1103 (DHS)).  This argument likewise fails.  "[T]he only agency action that can be compelled under the APA is action legally *required*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).  And Rancho Vista has not pointed to any legal requirement that DOD or DHS use separate statutory authorities to complete San Diego Project 4.  It therefore has no viable APA claim premised on the government's failure to take further action to construct the border wall.

None of the three relevant statutes require DOD or DHS to finish the project.  First, § 2808 does not require DOD to consider alternative statutes it could use to finish terminated projects.  *See* 10 U.S.C. § 2808(f) (providing only that "[t]he authority described in subsection (a) shall terminate . . . at the end of the . . . national emergency.").  Second, DOD's authority under § 284 to "construct[] . . . fences . . . to block drug smuggling corridors across international boundaries" also does not require it to build any particular portion of fence, especially in any particular area.  *See id.* § 284(b)(7) (using the term "may").  In fact, DOD may only invoke § 284 construction authority if requested by appropriate officials, *id.* § 284(a)(1), which Rancho Vista has not alleged occurred here.

Finally, DHS's power to "control and guard the boundaries and borders of the United States against the illegal entry of aliens," 8 U.S.C. § 1103(a)(5), is likewise inapposite for two reasons. For one, Rancho Vista has challenged the *DOD's* "decision to cease all work" on San Diego Project 4.  Compl. ¶¶ 13, 14, 15, 16.  It has provided no authority for the Court to order a separate agency to clean up DOD's unfinished work.  And to the extent that Rancho Vista intends to challenge DHS's failure to step in, that challenge would fail for the same reason as above: finishing DOD's halted project is not legally *required* by any statute.  Section 1103 gives DHS "substantial discretion in determining where to build fencing."  *United States v. Arizona*, No. 10-cv-1413, 2011 WL 13137062, at \*8 (D. Ariz. Oct. 21, 2011) (dismissing APA claim against DHS for failure to build border fence).  The APA does not authorize the Court to order DHS to exercise its discretionary enforcement power in such a specific way.  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

In sum, once the President declared an end to the national emergency, DOD was legally required to halt construction of the border fence under § 2808.  DOD or DHS arguably could finish San Diego Project 4 using other statutory authorities, but there is no basis under the APA for this Court to order them to do so.

### C.  NEPA and ESA Claims

The NEPA and the ESA both require agencies to comply with certain procedural requirements before undertaking certain major actions.  But neither statute applies to agency decisions that are nondiscretionary.  *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 673 (2007) ("[The ESA consultation requirement] appl[ies] only to 'actions in which there is discretionary Federal involvement or

control.'" (quoting 50 CFR § 402.03)).  For if "the agency does not have sufficient discretion to affect the outcome of its actions," then "the information that NEPA provides can have no [e]ffect on the agency's actions, and therefore NEPA is inapplicable."  *Citizens Against Rails-to-Trails*, 267 F.3d at 1151.  The same is true for the ESA's consultation requirement, and so "the Supreme Court itself has made clear that [that provision] of the ESA does not alter mandatory duties imposed on agencies by statute."  *Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184, 191 (D.D.C. 2019) (emphasis omitted) (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 644).

That is sufficient to resolve Rancho Vista's NEPA and ESA claims.  Rancho Vista alleges that DOD should have followed NEPA and ESA procedures before "making the decision to order its contractors to abandon the border fence construction site adjacent to Rancho Vista's property."  Compl. ¶¶ 19, 25.  But as explained, DOD did not have any discretion to rely on § 2808 authority once the President declared an end to the national emergency.  Because neither the ESA nor the NEPA applies to nondiscretionary agency action, Rancho Vista has failed to state a claim under either statute.[7]

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion to dismiss with prejudice.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

November 14, 2022

---

[7] Because Rancho Vista purports to bring its ESA claim under the APA, *see* Compl. at 1; Pl.'s Resp. at 27–29, the Court need not decide whether Rancho Vista failed to comply with the ESA's citizen-suit provision, *see* Defs.' Mot. at 29–31.